May it please the Court, Steve Berman on behalf of the plaintiff in this case. First, I'd like to address the express warranty issue, and then second, the implied warranty issue. With respect to the express warranty issue, the trial court erred in dismissing the complaint when the plaintiff alleged that there was a defect in materials, and the warranty clearly covered defect in materials. It matters not whether that defect is in all vehicles. If I'm a consumer, I expect the warranty to apply to my car, and I really could care less whether you're covering other people. So a reasonable consumer would expect that when you warranted a defect in materials, I had a defect in materials, I stated a claim. With respect to implied warranty claim, the court erred there because all the elements of an implied warranty were properly pled. Well, counsel, would you please point to us in the record where the complaint alleged defect in materials? Yes, sure, I will. The complaint alleges defect in materials in three different places. ER 58, which is the complaint, paragraph 13, alleges that the flexible resin will not expand properly. ER 66, paragraph 45, there we quote from the Toyota training manual that identifies the shrinkage of the fuel tank as being caused by, quote, resin material of which it is made. Okay, that's two. And the third is ER 70, paragraph 70, which says, Toyota breached express warranties by selling tanks with defective materials. Those are the three places we've alleged defect in materials. It is an 8A standard for the complaint, and the inferences are to be construed in our favor. We think that we did allege a defect in materials. Right, but you know after Twombly and Iqbal that you can't just make conclusory statements. There has to be some bone, some flesh put on the bones in terms of the allegations. The trial court didn't find the allegations of wanting in that regard. The trial court dismissed the defect claims for the reason that because the material defect was in all vehicles, it morphed into a design defect. Well, but the complaint did talk about design as well. Yes, and we planned in the alternative, which we think is a standard, acceptable practice in this circuit and in all courts, and it could be that both exist. As some of the authorities we've cited, like the track bicycle case, have said, it's a very fine line between what's a material defect and what's a design defect, and you let discovery flesh out which it is. Assuming that it's adequately planned, of course. Yes, but we think when we allege right out of Toyota's manual, in which they identify what the cause of the defect was, that we've properly alleged the facts supporting the defect. So to address the trial court's principle ruling that because it became a universal defect, that it turned it into a design defect, I would say two things. First, the warranty is to be construed against Toyota. It's construed in our favor. There is no exclusion for, quote, design defect. If Toyota wanted such an exclusion, they should have stated it. So what case law are you relying upon to support your argument that a design, that if a material defect applies to all of the products, that it's a design defect, it can't be a design defect? What case authority are you relying upon to support your argument that the district court erred in saying that because it was a universal defect, it was in the design of the car as opposed to the materials? Well, there is no case law addressing that either way, in my view. There's no case that says it is or it isn't. Why is it an error, then, if there's no case law either way? Because when you construe warranties, how a reasonable consumer would expect a warranty to apply. And this goes to the point I made when I began, and that is the following. If I have a defect in the resin, let's take the words out of their manual, there's a defect in the resin material, and I present my car to the dealership, and you've warranted against, quote, defects in materials, I expect you to repair my car. It's not reasonable for a consumer to be told, well, we admit it's a defect in materials, the trial court admitted we allege such, but suddenly your warranty is invalidated because other people have the same defect. I do not believe that's what a reasonable construction of the warranty implies. But let's assume that there was, that this is a design defect. Again, the trial court erred there, because if it is a design defect, the term workmanship in the cases that we've cited to this court, including the Fook Kong Sung case, which is a Ninth Circuit case, found that workmanship unambiguously includes losses caused by defects in the design and construction of a building. So we have circuit court authority, which the district court ignored in its ruling, which we believe warrants a reversal, even if it is a design defect. And that takes me to the implied warranty claim. Before you get to that, if I could ask a question on your express warranty claim, just to try to illustrate the point in my mind. Let's say that a car company designed a car made of glass, and they make it of glass. And when it hits any little thing, it shatters. And they warrant it against defects in material. Does the glass car come within that warranty, or is it a design defect? I would call that, in this case, a defect in workmanship. Why? Because the definition of workmanship under this court's authority means that you've constructed the car with, quote, the quality and skill that is part of a good design process. And that's, we're quoting right out of the dictionary, what workmanship means. That's my answer as to why. So you say it's workmanship because? Because the term workmanship, as defined by the dictionary authorities that we've supplied to the court in our brief, says it includes the skill and quality that's part of a good design process. So what does that mean in terms of the glass car? That there's shoddy workmanship? Is that your argument? My argument would be, to answer Judge Gould's question and your question, is that if you warranted the car for workmanship, and your glass was a bad idea, it was a bad design, that that is warranted within the term workmanship. To me, workmanship means the way something is put together. Whether or not it's put together as it was designed. Workmanship, to me, has a distinct meaning than how it was intended to be done. You can have a design that's not effectuated properly, or you can have a design that is effectuated properly, and to me that's workmanship, how the design is actually implemented. Well, again, going back to the court's decision in Foo, Kong, Sung, the court there defined workmanship to include losses caused by defects in the design and construction of a building. Design and construction. That's and, both of them, right? That's right. So turning to the applied warranty claim, generally to state an applied warranty claim, you have to show that the product was not the same quality as generally accepted, or not fit for ordinary purposes. Here, the plaintiffs have alleged both, that it's not fit, it's unsafe, and it doesn't meet commonly accepted standards for what you expect from your vehicle. So how is the product unsafe? Well, we gave four or five examples in the complaint. Consumers, and it's at ER 64, paragraph 34, paragraph 37, 39, and 65. These are all instances in which consumers were driving with their vehicles, and because their gas gauge was unreliable, they ran out of gas in a dangerous place. Those consumers all said, this was a safety issue, and they complained to Toyota. I don't want to be in a situation where my car runs out of gas, I wasn't anticipating it, that's a safety issue. And that's what exactly has been delivered to the plaintiffs in this case. They do not know when and if their car is going to run out of gas. Now, the trial court found that even accepting that there was a safety issue, that we gave examples of which, about two different class members, that the plaintiffs didn't allege that they had a prior warranty issue. But the plaintiffs alleged, at paragraph 21, that their vehicle's gas tank had shrunk, and they complained about it. And we allege, at paragraph 2, that once your tank shrinks, it renders the gas gauge unreliable. So the plaintiffs have alleged that they got a car that was not fit for ordinary purposes, it has a safety risk. They also allege that they have a car that wasn't up to accepted industry standards. These cars were marketed as high mileage cars. A car that gives you half the tank, that has caused the plaintiffs to alter, and they've alleged they altered their driving practices. They bought the car so they could go to work on one tank of gas. Did that alter how many miles per gallon the car actually achieved? Did the defective gas tank alter the gas mileage? No, just the amount available. So two things have happened. One, you can't go as far as you thought you would be able to when you bought this high mileage car. In their case, they were filling up once a week. Now they have to fill up less than that. And they avoid being in situations where they're in unfamiliar places, because the gas gauge is unreliable, so they don't want to run out of gas. Right. To me, there's a difference between how far you can go on the tank of gas and the gas mileage. The miles per gallon didn't change. That's correct. And a change in the miles per gallon wouldn't necessarily affect the safety issue, but a change in how much is in your tank and the fact that your gas gauge is no longer reliable, that is. But it was sold as a miles per gallon vehicle. This is the number of miles that you get per gallon with this car. And so if the intended use was to have a gas, a car that got high mileage from a gallon of gas, I don't know how that, if that was the intention, I don't know how that was violated, if you still got the same number of miles per gallon with a car. Let me answer that twofold. Number one, the plaintiffs allege that they expected the car, because it was represented to be a high mileage car, to get them a week's worth of gas. They're not getting that. So the fact that it may have the same miles per gallon, they're not getting what they paid for. And it has a material difference to them because they've changed their driving patterns. A car that causes you to stop repeatedly to fill up is simply not as valuable as a car that gets you through for the whole week. To put it, the way the Toyota likes to put it is, look, they still get 300 miles to the gallon. What's the problem? And I would cite to the court two cases in that regard, the ISIP case and the Stearns case. In the ISIP case and the Stearns case, both say the same thing. The fact that you continue to enjoy use of the product doesn't mean the product has failed and applied more to your merchantability. In the ISIP case, the cars, they smelled, they lurched, but they still got the passenger from A to B. In this case, they get the passenger from A to B, but they don't get them what was expected and generally expected of high mileage cars, a full tank of gas and a reliable gas gauge. And when those two things are missing, we've stated, we think, an applied warranty claim. Unless you have any further questions, I reserve for another time. Any other questions? All right, thank you, counsel. Thank you, notice. Good morning, your honors. May it please the court. I'm Michael Mallow from Logan Lode on behalf of the Toyota defendants. Your honor, in this case, the plaintiffs are trying to change nearly 100 years of standing California law regarding the distinction between meritorial defects and design defects. Additionally, I'm sorry, workmanship defects and material defects. Additionally, your honor, reading the plaintiff's complaint, it is clear that the grovement of plaintiff's claims are that using a resin for a fuel bladder is a design defect. Lastly, and I'm sorry. Well, before we leave that point, what about the references by opposing counsel to the specific allegations in the complaint that talk about the material that was used in the tank? Your honor, that's a great question, and I think what we should do is look at the allegations in the plaintiff's complaint, if we might. Okay. So the first one he cited was ER 58, paragraph 13. And in that paragraph, your honor, the plaintiff's alleged that the flexible resin of the fuel bladder, however, becomes far less flexible in cold weather. It contracts in cold weather, and it will not expand as fuel is added. As a result, consumers are only able to put as few as six gallons into a gas tank that Toyota states in e-brochures, and its owner's manual has an 11.9-gallon capacity. Okay. So let's address that. First, plaintiffs are not saying that the defect is that there's something wrong with this resin, and that a different resin would work as Toyota designed. And in fact, and the plaintiff could have, if there was a rule 11 basis to make that allegation, they could have made that allegation. Additionally, while the plaintiffs have done this in a number of places in their complaint, in fact, discussed this with you a moment ago, we have to look at the troops' case. We're not looking at Internet complaints. We're not looking at the prior plaintiff, Gertz's, complaint. We're looking at the troops' complaint. And the troops' allegations as to their experience is different than what is alleged in Paragraph 12. And plaintiffs have, in fact, pointed out Paragraph 21 of the complaint, and I think that is worth looking at. With Paragraph 21, and that's a reiteration of an earlier paragraph as well, Paragraph 21 is the first item. It is the Gertz, the Gertz 21 is the troop. Correct. Looking at 21, let's see what it says. It says, Mr. Troop, and this is about at line 18 of Paragraph 21, Mr. Troop noticed when he filled up the gas tank at two bars, it only took 6.5 gallons of gas. In other words, Mr. Troop was able to put in 6.5 additional gallons of gas beyond the two bars' worth of gas that was already in there. So this notion that the troops were only able to have a gas tank that contained 6 gallons is undermined by the plaintiffs' own allegations. Moving on to, I think, a counsel referred to Paragraph 45 as being an admission somehow by Toyota that there was a defect in the resin material. The court should look at Paragraph 45. There's no discussion whatsoever about Toyota indicating that there's a defect in the resin. The only information in the training manual provides information about how the fuel bladder works in cold weather. And there is no dispute that in cold weather, the fuel bladder can hold potentially less gasoline than in warmer weather. And there's nothing in the troops' allegations that suggests otherwise. So it was a disclosed design by Toyota, and plaintiffs acknowledge that it was a design intended to reduce hydrocarbons. And in the wintertime, when it is cold, a byproduct of the design is that the capacity of the fuel tank can be diminished. Plaintiffs are not challenging the nature, the type of resin that was used. They are challenging the fact that any variability exists. And counsel, if I could ask you a question on that. Sure. I think in my glass car hypothetical, which may have inartfully approached the subject, what I was wondering was whether something could be both a defect in design and a defect in materials. In other words, if something's a bad design, does that mean necessarily if it's a design defect, it can't be a material defect? Or could you have something that is a defect in both? The concepts are not mutually exclusive, Your Honor. So I might try to give a hypothetical example. Let's focus on a set of brakes, okay? Let's assume that the brake pads that have been used, that are specified by the manufacturer, are designed to be and are too small to adequately stop the vehicle given the vehicle's weight. So that would be a design defect. Let's also assume that the brake pad material, because of the manufacturing, has a crack in the material, so that when you apply the brakes, it will also crack off. So the brake pad material could be defective, and the design could be defective. So if you had the correct material, the car still wouldn't stop adequately. Does that make sense? I understand that. But still, if you used one material that wasn't cracked, but it was just like a dumb material to use, like it wouldn't work, is that a design defect, or is that a material defect? That would be a design defect, Your Honor. And as a design defect, based on the warranty that Toyota provided, that design defect would be addressable as an implied warranty claim, because the design is unsafe. You have a car that will crack and fall apart when you hit a bump. That car is not designed for its ordinary purpose. That would be an implied warranty claim. So you're saying that the troops may have had an implied warranty claim, but they didn't have an express warranty claim. Correct. So you're saying that if the troops had articulated that this particular resin did not work, but there is a resin that would have worked if the design had included that particular type of resin, then it would be a materials defect? That would be more akin to a materials defect, correct. And that's not what is alleged in the complaint. Right. I'm just trying to understand what your argument is. Right. So you're saying express warranty is out, but implied warranty is feasible? I'm sorry, say that one more time, Your Honor. You're saying express warranty is out, but implied warranty is feasible? An implied warranty that, if the plaintiffs are looking at a design defect, an implied warranty would be the cause of action that they can pursue. They could not pursue a cause of action on Toyota's express warranty, which is limited to materials and workmanship. Counsel indicates that there's no case law on the distinction between material defects and design defects, and that's not an accurate statement. Dating back to 1919, in the case of Moss v. Smith, California Supreme Court has noticed a distinction between a design defect and a defect of workmanship. You have to go back that far? Is there anything more recent than that? Sure. As recently as May of 2011, Judge Carter, down in the Central District, also citing to Moss v. Smith identifies the distinction that exists in California law. Is there any more recent California authority outside the federal court system that makes that distinction? Sure, Your Honor. Hold on one second. If we turn to McCabe v. American Honda, which is a case that the plaintiffs have criticized because it is a tort case, there is a discussion at pages 1119 and 1120 of that case that says, California recognizes two distinct categories of product defects, manufacturing defects and design defects. And the case cites to Barkers v. Lull Engineering, which is a 1978 case. Your Honor, just because the cases are old and the law hasn't changed doesn't make them bad cases. It's long-standing precedent. For almost 100 years, California has recognized this distinction, and there is no case, no case that says otherwise. And counsel cited to Your Honor the case of Sung, which is a Ninth Circuit case, for the proposition that somehow Sung has undermined and tossed out 100 years, or almost 100 years, of California precedent. And, Your Honors, I would impress upon you to go back and read Sung. Well, you're assuming we didn't read it in the first place. No, I'm just asking you to read it again. But if you go back and read Sung, the court talks in the conjunctive. It always says, and remember, let's step back. What the court is looking at is an exception in the insurance policy, and the exception is triggered if there's a defect in materials of workmanship. And the parties are sloppy, and unfortunately I think the court adopted that language from the parties, because they always speak in terms of design and construction defects in that case. They always talk in the conjunctive. So, if the parties were focusing on the design versus a construction defect, then Sung might have some value in terms of the way that plaintiffs are using it, but it doesn't. But what's very interesting about the Sung case, Your Honors, is if you go and look at pages, I think on here it's page 9, the court, the Ninth Circuit in Sung, actually does cite a California Supreme Court case. And it cites the California Supreme Court case for the following proposition. It says, faulty or defective workmanship means the faulty or defective execution of making or doing something. Support for this interpretation is found in Sabella with the Supreme Court of California. What page are you talking about? Could you give me the site? It is, hold on, let me back up. It looks like it's 1341. Okay, 1341. So, the Ninth Circuit, in talking about faulty workmanship, it does cite a California Supreme Court case, but the California Supreme Court case only talks about... Which case? The Sabella case. So, if you're following it, it's a paragraph that begins, we believe instead, that an understating interpretation... Okay, got it. Okay, so if you look, there's a citation to Kroll versus Great American, then there's a parenthetical, and then it says, support for this interpretation is found in Sabella with the Supreme Court of California, held an insurer liable for third-party negligence in the installation, that's workmanship, of a sewer line, which the court characterized several times as negligent workmanship. Nowhere is there any discussion that says a design defect is the same as a workmanship defect. And there's no California case that so holds. Well, but if you look at that next case that's cited, Kilroy, it again talks about negligent design and construction of an office building. So, you're making a point that that's, again, the sloppy semantics that include design and construction in the same breath? Correct. And in fact, what you, Your Honor, just read was the Ninth Circuit discussion of what Kilroy Industries versus United Pacific Company held. That's actually not a quote from the case itself. Does the Song case from the Ninth Circuit in any way conflict with the Sixth Circuit's decision in Lombard Corporation versus Quality Aluminum Products that said that the six, that held that a defect in material is a defect in quality, and a defect in workmanship is a defect in the way some part of the machine is constructed, unquote. That's at 261 feet per second at 338 through 39. Is that inconsistent with the Ninth Circuit's view? I believe the language is different, but the concept is the same. Design is how you're supposed to do something. The workmanship is the actual doing of the something. And that definition is articulated in the McCabe decision, which has some, I think, very good language on the definitional differences between a design defect and a manufacturing defect. That's at pages 1119 through 1120 of McCabe. I have 11, yeah, 1120, 1119 through 1120, correct. But it lays it right there. A manufacturing defect exists when an item is produced in a substandard condition. Which is referring to quality. Correct. Kelsey, your time has expired, but I would like for you to address the implied warranty, since you kind of hinted that, I mean, the implied warranty that that may be a viable cause of action. Well, I didn't say it was a viable cause of action. I said that would be the cause of action the plaintiffs would need to pursue if they're pursuing a defect in design. In other words, it's available. It's available. Okay. So let's take a look at what the troops have alleged their concerns are in the case. Paragraph 21 is the most factually vibrant paragraph in the plaintiff's complaint. What paragraph 21 says is that the troops complain that their fuel tank has shrunk. And they say that they, that Mr. Troop noticed, I'm reading at line 18, Mr. Troop noticed when he filled up the gas tank at two bars, it took only 6.5 gallons of gas. Within the warranty period, and the plaintiffs provide a date, November 2010, and we know that this case is in Pennsylvania. So we know it's Pennsylvania in November. It's likely that it's cold. So this is the situation where you would expect contraction of the fuel tank. Well, at line 23 it says the troops bought the Prius in part because they believed they would not have to go to the gas station as often. So that harkens back to opposing counsel's representation regarding the intended use of this vehicle was for, to be able to drive without stopping frequently at the gas station. Two points on that, Your Honor. Point number one, this case has no representative claims involved in it. This is not an advertising and marketing case. This case is brought strictly on an applied warranty or on Toyota's basic express warranty. The implied warranty of merchantability means that the car does not operate as an ordinary car would operate. Now, I am sympathetic. Not as an ordinary car, but as this car is supposed to operate. An implied warranty is not as to this car. An implied warranty is a minimum standard that applies to all vehicles. So is it your argument that the gas mileage has nothing to do with the implied warranty in this case? Correct. The only complaint that the troops have articulated in their complaint is I have to stop at the gas station a little more frequently than I want to. And I'm sympathetic to their claim that they have been inconvenienced. They'd rather stop once a week as opposed to perhaps once, twice a week. But a matter of convenience is not a defect that is so significant that it impacts the ability of the car to perform its intended function, which is to drive on the roads. And this is what Judge Gutierrez promptly found. A car that, based on the worst allegations of plaintiff's complaint, that gets 300 miles between Phillips is not a car that is inoperable. Well, Islips told us that it's not just that a car will go. So it's something beyond a car being able to drive. It can't just be that a car, you put the key in the ignition, the car starts, and it goes. It can't be that because Islips tells us there's a certain quality that's imputed in the implied warranty. And in those situations, you have a car that they use to have the laundry list. It smells. It lurches. It runs rough. But the plaintiffs aren't alleging that there's any operational problem with the Prius at all. The only complaint that they have is they have to go to the gas station more than they want to. Your opponent pointed out the Islip case, California Supreme Court, California Appellate Court decision from 2007. Wasn't the allegation in that case that the plaintiff there had cut their driving in half for fear that the car was unsafe and would break down? Isn't it somewhat similar here that the driving habits of these plaintiffs are adjusted because of their fear that it won't get to the point they want to get to? Your Honor, that's an excellent point. I'm glad you raised it. That was an argument made in the reply briefs that they had somehow changed and there was fear and what have you. None of that is reflected in the complaint. Not one word of fear. The only thing that's reflected in the complaint is that on November of 2010, Mr. Chu called up a Toyota dealer and said, I'm only able to put 6.5 gallons of gas in my gas tank when it's filled with two bars. Now, if you do some quick math, that's actually closer to nine gallons than six gallons. But that's all he tells the Toyota dealer. And the Toyota dealer rightly says to him, it's November, it's cold. That's how this thing works. Well, so would it be practical to remand if that's a viable allegation that can be made in the complaint? Couldn't the complaint be amended to include those allegations? Two responses to that, Your Honor. Number one, this is the fifth attempt at plaintiffs alleging a claim against Toyota. So, I mean, if we were at the first, at the first motion, the first attempt and Judge Gutierrez denied any further attempts, perhaps five attempts to allege a claim, second by the troops, and no, not prior to, you know, nowhere does Mr. Chu or Ms. Chu say, I was concerned that I was going to run out of gas.  But if plaintiff alleges that this problem presents a serious safety issue, especially in cold weather when traveling in remote areas, that doesn't have some viability there? A serious safety issue based on what? If they allege that this problem presents a serious safety issue, especially in cold weather when traveling in remote areas. That they may run out of gas in an unsafe location. Doesn't that raise the issue of fit for intended use? No, because the troops, their experience never suggests that the gas gauge was anything other than its intended accuracy. So you're saying that the gas gauge was accurate if the troops took into consideration that in the wintertime it would shrink? I'm not saying that at all, Your Honor. What I'm saying is there is no allegation in this complaint that the troops had concern that their gas gauge was indicating that there was more or less gas than was actually in that tank. The only thing they complained about is the fact that they had to stop more frequently for gas because they were only getting, you know, they were getting the gas mileage, well, they were stopping more frequently than they would like to. That's the only complaint we have from the troops in this case. There's a bunch of Internet stuff that talks about people having concerns about the gas gauge. We don't know whether that's legitimate, not legitimate. Those people are not before the court. The only people in front of the court were the troops, and the troops do not allege that they ever ran out of gas, that they ever had concern about the accuracy of the gas gauge, that the gas gauge was ineffective. The only thing we know from them is that they had to stop more frequently for gas. All right, counsel, you've way exceeded your time. Unless there are other questions from the panel, we'll go with rebuttal. Thank you. May I please, the court, three quick points I'd like to make on rebuttal. First, I don't think you need to get into the design defect because you can quickly and easily resolve this issue that we allege a material defect. And I would add one other allegation for you to look at, and that is at paragraph 49. Paragraph 49, we allege that in mid-2009, TITO announced the 2010 Prius would not use a fuel bladder, but instead would use a rigid tank. So they changed, after the outcry over this problem, they changed to a different material. That lends support to the inference that we have probably alleged a defect in materials. If you do want to go to the design area, counsel has said that you would be changing 100 years of California law. That's not correct. There's two different cases. One is a product liability case. In product liability cases, California courts look at the difference between a manufacturing defect and a design defect and how you clean each. This is a contract case. And as a recent decision in Dickerson v. Electrolux analyzed, consistent with the brief that we submitted to this court, there are different principles when you're interpreting the words of a contract. Here, the interpretation of the contract is going to be construed in the plaintiff's favor. It does not exclude the word design. Toyota is a very sophisticated company. If they wanted to have a design defect exclusion, they should have said so. Counsel, do you agree that we are limited to the allegations that were made by the troops? Yes. And the troops allege, and that was the last point I was going to make, they allege not only that they have a fuel bladder that has shrunk on them, but here's what they said about their injury. And this is at ER 74, paragraph 88. Plaintiffs have suffered injury, and the plaintiffs include the troops, from purchasing the cars that have shrinking gas tanks, gas tanks that once shrunken do not return to normal size, and cars with inaccurate fuel gauges. So what counsel has said and what the trial court said is the troops, they basically have worked around this. They know now that their fuel gauge may not be accurate, so they shouldn't put themselves in a position of danger. But do you see, I mean, could you point us to where the troops have made an allegation that there was a safety-related injury? I think when you allege at paragraph, you put it all together in the following. Paragraph 21, they allege they had the shrinking bladder. Paragraph 2 says, if you have a shrinking bladder, your gas gauge is unreliable. An unreliable gas gauge is a safety issue. Well, that's a leap. I mean, I thought there were allegations of being stranded in remote or dangerous locations that typified. But that's, I mean, if it's not in the complaint. It is in the complaint. Okay, could you show us where those are? From the troops. Not from the troops. But I thought you agreed that we're limited to the allegations that were made by the troops at this point. Well, the troops, then I misunderstood exactly what you're asking me. The troops gave examples of other motorists who were stranded in places they didn't want to be stranded when they ran out of gas. That, we believe, creates an inference in addition to common sense that an inaccurate gas gauge can be a safety problem. It creates an inference and bolsters the safety allegations here. I mean, if your gas gauge is inaccurate and you stop somewhere in a dark place where you don't want to be in a bad part of town, that's a safety issue. The troops allege that their gauge is inaccurate and they, therefore, are exposed to that potential safety issue. But we can't give them relief for an injury that didn't occur to them. I mean, if there are no safety-related issues that they've articulated in the complaint. The only reason that they have no safety issue is because they learned about the problem from the dealer and now they can drive around it. But I submit that an applied warranty of merchantability doesn't require a workaround like that. And it's not only limited to safety. An applied warranty of merchantability is breached where you deliver a car that's not up to common standard. And I submit to the court, every driver expects their gas gauge to be reliable. That's common. And the troops did not get a reliable gas gauge. All right. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case on calendar for argument is Aberdeen v. Toyota. Good morning or afternoon. Glenn Dannis for Appellants Post and Gray. I guess what I'd like to start with is the fact that when we were in this court a couple of years ago, the court had directed the district court on remand to look into two main issues. One is to whether or not California law embraces a thorough emission theory of liability in the non-warranty context. And second, whether California law creates a duty to disclose what Toyota knew from internal testing about the actual fuel MPG of the Toyota Prius and failed to disclose. The district court on remand immediately went into failure to disclose cases in the warranty context. It did not ever endeavor to look at pure emission cases and whether in fact California has or recognizes a pure emission cause of action. The district court immediately went to Doherty, which is a case involving latent product defects that only manifested themselves outside of the warranty period. It then went on to Barden, O-Striker, Harmonix, and Smith v. Ford. All cases that were latent product defect cases that involved an allegation of a latent product defect that manifested outside of the warranty period and therefore required that there be a safety issue or an affirmative misrepresentation. The court brushed aside Falk, the Falk case, saying that it was inapplicable because Falk involves safety and this case does not. And then it brushed aside the most recent and directly on point E-Machine, Collins v. E-Machine case, dismissing it as a warranty case when in fact it was not a warranty case. Under the UCL, conduct that is likely to deceive a reasonable consumer satisfies the prong, the fraud prong of that statute. And materiality is the limiting principle. So materiality and likely to deceive are all that is required under the fraud prong of the UCL in order to state a cause of action. Under the UCL, as articulated in the Day case, a perfectly true statement couched in such a manner that it's likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections. Counsel, I have a more fundamental question that I want to ask. Is it true that the plaintiffs in this case don't seek to represent anyone who bought or leased a Prius in California? That's correct, Your Honor. So I'm curious as to how non-California residents can pursue a claim under the CLRA or the UCL. I thought those were expressly precluded under California law. Well, I think, Your Honor, I might be referring to the Mazda case, and this was something that actually was not – Mazda had come down, I believe, eight days before the hearing on the motion to dismiss on remand, and it was something that the district court didn't reach. During the hearing on the motion to dismiss, the district court, when my able opposing counsel attempted to raise the issue, said, we're simply wanting to just put a period there. We're not going to get into that. Okay, so assuming that we want to go beyond that period, what do you say about the holding in Mazda and whether or not that precludes the plaintiff's claims? Well, I think, Your Honor, it's just not properly teed up. I mean, basically, there would need to be – It's an issue of law. It is an issue of law that hasn't really been briefed here, certainly wasn't briefed or decided below, and really was not briefed here, even by Toyota. No party in the appellate briefs did the appropriate choice of law analysis, looking at the different states' interest in having their law apply. I know that Toyota did cursorily say that two different sets of laws, or the laws of New York and Washington, have safe harbor provisions. Neither party briefed it. I know that Toyota attempted to buttress its point by citing to a Florida and Arkansas case. It's unfair how Florida and Arkansas cases would support the fact that New York and Washington have safe harbor provisions. Why does it have to be a conflict of law issue if the California statute, regardless of how this conflict of law analysis came out, you're still seeking to apply California law to non-California residents? I think Mazda says you can't do that. So regardless of how the choice of law issue comes out, why wouldn't Mazda preclude the lawsuit from going forward at all? Well, my understanding, Your Honor, is that where you have the nexus of the action being in California, and in this case it's undisputed that Toyota is located here and employed internal research people and advertising firms in California where we would submit and we allege that the nexus of the wrong occurred in California, that there was no barred extraterritorial application. Counsel, if I could interject, it's hard to remember all the details of every case we sat on, but I'm pretty sure I wrote the Mazda case. And I'm pretty sure that the things you're saying now were probably true in that case, too. The car manufacturer had major offices in California, and there was a claim nexus to California and had an interest of California having their law apply to any claim brought in their form. But that case talked about, if I'm remembering this right, that also other states would have an interest in the law of their state supplying, you know, to purchases made in their state. And, you know, some state might want to have more strict or more liberal product liability laws to try to entice people to come to their state and do business. So I was really kind of at a loss when I read in the briefing and the transcript that the judge said, leave Mazda for another day. And I wonder if it was just that I was too close to it, but I didn't know how you could quite leave for another day and wish to go out of class. That's a very good question, Your Honor. I think that it probably should have been, in retrospect, an issue that was decided below and something that we were given supplemental briefing on. We were never given an opportunity to brief the impact of the very important Mazda decision when we were below in the district court. Yeah, I'm not even saying it's very important. It might be wrong. But I feel like in this case, as the case is presented in the briefs, I see a big major issue whether California law would apply the Falk-Lamadry test or the Darby-Barton test. And then I ask myself, well, why should we certify that to the state Supreme Court and let them resolve it? But then I wonder, well, why should we certify a case to the California Supreme Court when the plaintiffs bought their cars in Washington and New York, and I'm not sure California law should really be applied to that. Well, I have to say that all that I know about that issue is that California does not have the safe harbor provision that those other states have. I would submit that the analysis would be entirely different than the way that this case has been briefed in either court if California law were held not to apply. I really, I'm sorry, I just can't speak more to it. We would be happy to do supplemental briefing on that for the courts if the court would prefer in order to be able to determine that. I'm just, I'm not an expert in the New York safe harbor, and it just wasn't briefed. So I apologize. Don't worry about that. I don't know about that. I'm sorry, Judge Gould. I was just going to say, no apologies needed. You should go ahead, Judge Gould. I was just going to say that to me, I can't speak for the other members of the panel, but to me the Maza issue is the positive of this case. I just don't see that the California legislature intended for its consumer protection laws to have extraterritorial effect regardless of the choice of law issue. So maybe we can hear from Toyota and see if we can be further enlightened, and then we'll give you the opportunity to come back. Thank you very much. All right. Thank you. I think it's officially good afternoon, Your Honors. Yes. Michael Malo, Logan Rose. Unfortunately. I'm sorry to defend here before you again. I joked around that this is my birthday present from the Ninth Circuit. Happy birthday. Thank you. Judge Gould, let me see if I can. By the way, your memory is excellent on the case you wrote. But here's how we presented the argument before Judge Gutierrez as it related to the conflict of law issues. I think counsel misspoke when he said that Toyota did not brief the conflict of law issue to Judge Gutierrez. In fact, excerpt of record, it looks like you are. I thought you had raised it in your briefs. But then when you were at oral argument, the sense I had, maybe it's an old sense of litigation, was that Toyota felt from something maybe that was said that the judge was going to get rid of the case under Pazulano. And so when Mazza came up, just told the judge, as far as you were concerned, it could be for another day. Well, I think the response was, and again, I'm working off of my memory as well, Your Honor, the first question is, is there a difference in the law between California, Washington, and New York? And based on the Pazulano decision, which Toyota believes is the beginning and end to the plaintiff's claims related to MPG, amounts per gallon, there is no conflict between the laws of California, Washington, and New York. So if there's no conflict between the laws, if the law is the same, doing a conflict of law analysis, as Your Honor did in Mazza, is unnecessary. That being said, we did indicate to Judge Gutierrez in the briefing, if you think that California law yields a different result than New York or Washington, that both have safe harbors and would preclude plaintiff's claims, then we need to look at that conflict of law analysis. And that would be essentially the Mazza analysis. There is a difference in the laws, which state's interest is paramount. And as Your Honor articulated in Mazza, the law where the consumer has purchased the vehicle, the state of that jurisdiction would have a bigger and more significant interest in applying the laws of its own state than perhaps what is being applied in California. But in this case, there is no distinction. The result, Paduano essentially creates the same result as you would get in Washington and New York. Even if we got to California law being applied here, would it apply in this case? Would the consumer protection laws of California apply to the facts of this case for non-California resident purchase vehicles outside California? The answer is California law would not apply. I don't understand why we would be doing a conflict of laws analysis if bottom line the law would not apply to this case. The Mazza decision makes it much easier for us to just turn around and say, hey, these consumers bought their cars in New York and Washington. California law doesn't apply. But when we were first briefing this case, we didn't have the benefit of Mazza. We had the Norwest decision that kind of led to some confusion. You know, Norris holding that if there is sufficient California contacts, it wouldn't violate due process to apply California law. And in that situation, then you do your conflict of law analysis. So basically, the first step then on the conflict of law analysis is the law difference. And that's how we ended up where we ended up. But subsequent to Mazza, I agree with Your Honor, California law doesn't apply to this case. So what do you think is the appropriate remedy in this case? Should we, maybe remedy is not the right word, maybe the procedure. What's the appropriate procedure? Should we remand the case back to the district court judge to consider Mazza? Or should we apply Mazza? What do you think is the appropriate procedure for us to follow in this case? Given that this is essentially how it's positioned right now, this is strictly a legal argument, there would be no benefit to remanding the case back to Mazza. Judge Gutierrez would have to rule when presented with the facts of this case that California law doesn't apply, that the plaintiffs have not brought forth any claims under California law, and he'd have to dismiss this case. In which case, we'd end up back here in front of the Ninth Circuit again for a third time. We know from the allegations and complaint, and the fact that Toyota did brief below the fact that Washington and New York law preclude the claims, and have argued in their briefing that Washington and New York law precludes the claims, that is sufficient record for this court to make a decision that the plaintiffs have not alleged viable claims and to affirm Judge Gutierrez's rule. Well, probably, in terms of procedure, even if we were inclined in the direction you've argued, what we should probably do is send an order out asking you and the appellant to say what is the effect or significance of Mazza on this case, and let people be heard. Because I'm sure that the plaintiffs in the case don't necessarily agree that Mazza is the greatest opinion since sliced bread. Your Honor, I would say that it is the greatest opinion since sliced bread, but putting that aside, the truth is the plaintiffs, if they did not focus sufficient attention on the fact that they brought the issue that's raised by Mazza, can they have viable California claims with a Washington and New York resident, they didn't brief at their own peril, because clearly Toyota raised that as an issue, and raised it as an issue before Judge Gutierrez, who did in fact dismiss the case under California law, which is the best and only chance the plaintiffs had of alleging a viable class, and it was raised before this court in Toyota's brief, which the plaintiffs had an opportunity to reply to. So, you know, the plaintiffs saying we didn't know that Mazza was an issue, we didn't know this choice of law is an issue, they knew about it and they knew about it back in front of Judge Gutierrez. Your Honor, basically, as I indicated, whether you look at this case from the perspective of Washington and New York law, which has a safe harbor applicable to Toyota for essentially representing EPA estimated gas mileage, or you look at this case under California law, the conclusion is the same. A manufacturer cannot be sued as a result of representing accurate EPA estimated mileage, and a manufacturer has no duty to disclose information that is different from, in addition to, or contrary to the EPA estimated mileage, and that is the Paduano decision. Well, what if the allegation is that Toyota went beyond the EPA estimates and said you, affirmatively, that you will get a certain number of miles per gallon with this car, and that was a misrepresentation. Would that be outside the Paduano situation? Well, I mean, that is the Paduano case where it was alleged that Honda had made statements about fuel economy that was in excess or different than the EPA estimated MPG, but that's not an issue in this case. That's not an issue in this case? That is not an issue in this case. In fact, plaintiffs allege, although it's kind of difficult to navigate the plaintiff's complaint, but if you look at the plaintiff's complaint, which is Exerts of Record, I think it's 6-35. It says that at paragraph 2, lines 21 and 22, this case does not, in other words, concern allegations of Toyota's affirmative misrepresentations. What the plaintiffs are basically alleging is, assume that Toyota, we're alleging that Toyota didn't say anything, but Toyota nonetheless had a duty to present information that was contrary to or different from the EPA estimates, and as you know from the holding in Paduano, at least as the California law, a manufacturer cannot be compelled to have to provide that information, and of course, under Washington, New York law, there are safe harbors for that situation. Okay, so did the plaintiffs allege, then perhaps I misstated the complaint. Did the plaintiffs allege that Toyota did not merely advertise the Prius as having the estimated miles per gallon, but it was able to achieve that fuel efficiency under normal driving conditions? Would that be a different complaint? Not something different than the EPA estimates, but that it's not in fact an estimate, that you actually would be able to achieve this mile per gallon activity under normal driving conditions, and it wasn't true. Let me make, just to reiterate, make sure I understand the question. So instead of having a representation that here are the EPA estimates, basically Toyota made, assumed Toyota made a representation that, hey, those EPA estimates, you're going to get those, and you're going to get those under normal driving conditions. Right. That would be problematic. Right. That's not the case. Oh, I thought that was the assertion that was made in the, it's not. It is not. Okay. Now, as I said, Your Honor, this is a very tortured complaint. There's lots and lots of stuff in there. Uh-huh. But the paragraph that Your Honor should focus on in terms of how, this is the direction on how to read this complaint, is paragraph two that says the case is not based on Toyota's affirmative representation. I'm trying to find a complaint because for some reason I have that in my mind that it's in there. So what, do you know right offhand where the complaint is in the excerpts of the record? Let me give you the site. It is 6-35? Oh, you know, it's because it's under SEAL. Maybe that's more problematic. The complaint's under SEAL? Uh-huh. Yes. Okay. And in fact, it's also, if you look at paragraph 46 of Plaintiff's complaint. Well, I don't want to discuss anything that's under SEAL. What we're discussing right now is not the under SEAL part. Okay. Plaintiff's affirmatively alleged in paragraph 46, lines 16 through 19, the fuel economy estimates that Toyota advertised in print on television and on the Internet for TPH, that's the Toyota Prius Hybrid, are those measured pursuant to the EPA? Is this the Fourth Amendment complaint? I'm looking at the Fourth Amendment complaint, which I think is the operative one. It is called the Second Amendment. Okay. Well, then that probably has been superseded, what you're reading from, right? If it's the Fourth Amendment, I thought the Fourth Amendment class action complaint was the operative complaint. I think I understand what's going on. The Fourth Amendment class action complaint was in GERTS. That was the case we just argued. Oh, I'm looking at the wrong case. If Your Honor may, and perhaps- Yeah, I'm looking at the wrong case. Aberdeen is what I need to look at. Okay. Now, if you're adding up complaints, this actually is number four, but that probably creates more confusion. Okay. All right. So, okay. Now I have the right record. Okay. So, what I wanted to look at was on page, I think it's eight. This is the second in the complaint, right? That's what I have in front of me, Your Honor. Okay. Go ahead. I'm trying to find what I'm looking for. Go ahead. Oh, okay. Counsel, could you clarify something for me? Do I recall that, in this case, it's a nationwide class alleged, but does it exclude California residents? Your Honor is correct. The allegations of the complaint specifically, paragraph one of the complaint at line, which is page one, lines nine through 11, indicate that this is a class action brought by plaintiffs on behalf of a class of all persons in the United States, parenthetical, excluding residents of the state of California or any individuals who purchased or leased a Prius in California. So, this case has a lot of histories in it to me. So, why is that, that the class excludes California residents? Was there another case pending? The plaintiff, step back, I'll give, to reiterate a little history. Originally, this case was filed by Mr. Aberdeen as a nationwide class. The case went to a class certification hearing. Judge Gutierrez denied certification in sua sponte, dismissed the case for lack of subject matter jurisdiction under CAFA. Then, it came up to the Ninth Circuit. The Ninth Circuit affirmed Judge Gutierrez' denial of class certification, but remanded the case based on the sua sponte dismissal. When the case was, when Mr. Aberdeen was substituted out of the case and Post and Gray were added to the case, at the same time, plaintiffs, or a little bit before that, I apologize, plaintiffs filed a state court action with the same, essentially the same allegations, and that case has been stayed and is pending in Central Civil West. So, the reason that you have the California purchasers carved out of this federal case is because plaintiffs have filed a state MPG representations in California state court. So, Counselor, okay, now I'm at EUS 15, which is the second minute complaint. I think I'm at the paragraph directly below the one you read, paragraph 46. And this is not sealed, right? This is not sealed. Okay, so I'm at paragraph 46, and this is what I was referencing when I thought the plaintiffs were alleging that even though Toyota was new, Toyota was referencing the EPA estimates, it in fact, the estimates that are advertised in print, on television, and on the Internet, are those measured pursuant to the laboratory testing methods. However, it knew at all relevant times that the fuel efficiency numbers were grossly inflated and created reasonable consumer expectations that Toyota could not meet. So, in other words, the plaintiffs were saying Toyota is new, that the cars that it was touting did not give the fuel economy that it's saying that it does, basically. What the plaintiffs are saying in this paragraph is that Toyota represented the EPA estimated miles per gallon. Knowing that its cars did not get that fuel mileage. That's the plaintiff's allegation. But that issue was squarely addressed in Paduano because the same allegations were made against Honda. And what the California Court of Appeals said in Paduano is that aspect of Mr. Paduano's case is not actionable. Yes, Honda may have known something, but Honda has no duty to disclose information that in addition to, that's contrary to, or different from the EPA estimates. What Honda did was had allegations that were different than EPA, that you will get these miles per gallon if you drive the car in a certain way, which was apparently contrary, or at least alleged to be contrary to the facts. That's not this case. In this case, the plaintiff's real argument is, when you really get down to it, Toyota, you didn't say anything. You just used the EPA estimates, and you didn't say anything. And you had an obligation to say something. But the law in California... What language in Paduano are you saying totally forecloses this argument? If recollection serves, Your Honor, it's page 342 of the decision. Page 342, Paduano. It's 169 Cal. Act 4, 1453. Is that right? I believe that. Let me pull the case up. I have it down as page... I don't see a page 300 here. 1482. I apologize. The quote is, as a matter of law, there is nothing false or misleading about Honda's advertising with regard to its statements that identify the EPA fuel economy estimates for the two civic hybrids. Where does it say that they had no obligation if they knew something different to disclose that? This is where the court is doing the analysis, the preemption analysis. What page? I'm sorry. This is the 1482 page. As long as a state's regulation does not require a manufacturer to provide a fuel estimate different from the EPA fuel economy estimate or to make claims that go beyond or are contrary to what the federal scheme requires, the EPCA does not preempt such regulation. That doesn't say that if the car manufacturer has affirmative knowledge that the cars don't meet the EPA, that they don't have to disclose that. I think you're reading a little more into it than it says. It's no big deal. I was just curious as to where you got that. That's where I'm taking it from. The implication of the statement, just to finish the thought, Your Honor, is if you have no duty, if a state's regulation, in other words, the UCL, the CLRA, or state common law, so long as it doesn't require the manufacturer to, in fact, disclose the type of information that the plaintiffs are saying Toyota has to disclose. No, not disclose, not to do additional testing. That's what I read. That is saying that there is no requirement that the manufacturer do additional testing. I don't think it makes the other leap to say if they do it, then they don't have to disclose it. I'm quibbling. Okay, thank you, counsel. Your time has expired. Thank you, Your Honor. All right. Rebuttal. Okay. I just wanted to begin by saying that I agree with Judge Gould that if the court is so inclined to want to, or is at least leaning toward deciding the case on choice of law issues or on whether or not California law can apply, we would definitely like to do additional briefing on that. But why didn't you brief that issue in your reply brief? Well, frankly, because the other side didn't really brief it either. I mean, they touched on it. It's the last issue, I believe, in their appellee's brief, and they didn't engage in a governmental interest analysis. They didn't engage in, I don't believe they cited any cases from New York and Washington to show how the safe harbor is actually used in those states. They simply said conclusively that those two states have safe harbors. They cited two other states that have safe harbors that have had some case law, and that was the end of the issue. But they cited MASA. They did cite MASA, and we did respond to it saying that we thought that their analysis, because they essentially had no analysis, that it wasn't properly teed up for briefing, and because it had nothing to do with the court below's decision, and because Toyota had said in the court below, you know, fine, they're okay with essentially not getting into it. But, counsel, if I can jump in on this. If this court finds that there's no cause of action under California law, what would be the purpose of remanding to do a choice of law analysis under New York or, I forgot the other jurisdiction, that you had alternatively pled in your complaint? New York, and what other state was it? Washington. Washington, yeah. Well, I was suggesting actually that we do additional briefing here, not necessarily on remand, but I agree that it's likely that if there is not, my understanding of it is that if there is no cause of action under California law, then there is likely not one under those other states, and I believe that's Toyota's tradition, and I know of nothing that would suggest that that's not right. We do not agree that there is no cause of action under California law. The Paduano case, I think, has been misrepresented here. Essentially, the Paduano case was whether or not affirmative representations made in conjunction with an EPA estimate are shielded as preempted under the EPCA. The court found that they are not. That California UCL and TLRA law has a very active role in regulating how auto manufacturers market cars, and said that essentially that even though you cannot be liable solely for a misrepresentation of the EPA estimate, statements made in conjunction with it are not actionable. Our cause of action is mainly based on the theory that omissions that are made in conjunction with an EPA estimate are likewise actionable. Under California law in 1975, the outboard marine case said that essentially omissions are simply the flip side of affirmative representations. There is ample case law that we cited in our brief saying that the CLRA recognizes actionable omissions. There is no question that there, in fact, are actionable omission cases. The district court below would have those be limited to safety-related and warranty cases, and our position was that is a subset of the overall UCL and CLRA law, which relates only to latent defect cases. But if the consumer is aware of, perhaps, that access of the information that is contrary, say, to the EPA information, does that make a difference in our analysis? I don't think it does, Your Honor. In fact, in the Falk case, they specifically looked at that, and Judge Alsup said, look, in that case, there was ample, there were hundreds, if not thousands of complaints on the Internet about the fact that these speedometers were failing. There was, there might have been other information out there. He said consumers are not under a duty to go and hit the books and hit Google and do that kind of research before buying a car. Judge Gutierrez seemed to say that because there had been some articles about the fact that the Prius was getting far less mileage than it was advertised as, that consumers should have been on notice of that. And our position is, even if that were true, even if it were true that, in fact, you know, once the first car rolls out of the lot, I believe is what he said, it's now out there and everyone should be aware of it and you buy it through it in peril, even if that were so, we've alleged facts that a consumer, if they knew, would certainly have given pause to paying all that extra money to buy a Prius. We had allegations that the director of the EPA had made a complaint to Toyota and had been told that it's her driving habits that are at fault. There are other people who made complaints that are in our allegations that say that when they, I'm sorry, that when they complained, they were also told that it was their driving habits that were at fault. One of them was told that there's a 15,000-mile break-in period, so basically, hang tight, you know, don't worry about it right now. Maybe in a year you can come back and ask if your car isn't properly broken in and you're not getting the mileage that you had been promised. Maybe then you've got a problem. Another one said, take a long trip and, you know, basically count your own mileage and then come back to us and see what's going on. And, you know, so it's our, you know, it's our position that under the case law, those kinds of allegations of, you know, customer complaints, of internal testing, of prominent, you know, prominent members of the community complaining about their car not getting the mileage that they wanted, if those things were known, those would be something that someone would say, yeah, before I spend, you know, extra mileage or better mileage. I mean, that's essentially why people buy Priuses. In the eMachines case, they made the, the California Court of Appeal made the, made the direct point of saying, look, you know, the Barden and Daugherty cases are an opposite because those are cases, Barden, for instance, dealing with, you know, exhaust manifolds, that's something that people just don't care that much about. People don't have an expectation about whether it's steel tubing or iron that makes an exhaust manifold. But when people buy a computer, they expect that they're not going to lose all their data due to defective floppy disk drives. The same thing is true with the Prius. When people buy a Prius, the reason why they are buying it, in most cases, and Toyota's internal data showed that, was because they expected to be getting, you know, way premium mileage, 55 miles per gallon. Our complaint is, is quite simple. It's that Toyota can't say, and their defense seems to basically be, because the EPA has spoken here and we're required to put a Monroney sticker on the car, we can't be forced to say anything beyond that. Are there any safety concerns raised by the omissions, as you call it? There are not. We're not making a safety-related argument. We're saying that there is a long history of cases under California law. We've cited many of them, the Day case, the Pastorian case, Morgan v. AT&T, MassMutual, and most recently, Collin v. E-Machines, all of them saying UCL and the CLRA are very broad statutes. They are not specific to, you know, safety or latent defects or those types of cases. They basically say, if a, there doesn't even have to have been a representation at all, but if there's a representation, an omission, or other conduct that tends to deceive, that those things are actionable. And that's exactly what the courts say. Now, there is a particular subset of case law that says, where there are latent defects involved, they're going to put a limit on it. Because as this court recognized in the Wilson case, I believe from last year, if you don't find that subset of cases in latent product defect cases to be sort of carved out of the general duty not to deceive, you will then be warranting these types of latent defects forever and basically nullifying limited warranties. And the court said, as a policy matter, we're going to impose an extra limitation on that and say, okay, there's got to be an end to it. And if you're saying that there's a latent defect in this product, you know, you can't have, we're going to say, as a matter of law, you can't have a reasonable expectation that the product is going to last forever and we're going to, as a court, we're going to put a top end on that. And that's the end of the warranty. But this isn't that type of case. This isn't a case having to do with a defect. Like the eMachines case, this is a case where from the day that these cars were made available, Toyota was in sole possession of certain information and in far superior possession of other information that basically said that the reason why people buy these cars is not true. And that's why there were thousands of complaints. That's why the EPA director herself said, what's going on here? You know, I bought this car for the reason of getting better mileage and I'm not getting it. I could have bought a VW that runs on diesel and gotten better mileage. And instead of them actually, instead of Toyota actually looking at that issue and, you know, issuing additional information, doing a recall, putting something into the press, basically what Toyota said to the head of the EPA was, it must be your driving that's at fault. Get back to us after you try and change your driving habits. You know, so in our point of view, if the court is likely to look at this as whether we've stated a cause of action under California law, we think we absolutely have. Padawano did not deal with omissions. And despite what the opposing counsel says, to the extent that there's dicta in the case saying that, you know, Toyota can't be, you know, made to say any additional information, I agree with Your Honor, who seems to be saying that it could be that what they were saying is you don't have to do additional testing, but once you do it, you have a duty under California state law to make that known to consumers, because that's something that would be material and people want to know about. And that's, in fact, what the federal district court said in the day. I'm sorry, in the Trum case, which is very similar. It basically said, just to quote it very briefly, it said, Congress intended to leave regulation of false advertising and unfair practices for auto manufacturers to the state. And this is, in fact, what, you know, precisely one of those cases where, you know, this is a state issue that is not preempted under Padawano, and Padawano simply didn't have occasion to decide whether, if a car manufacturer is in actual possession of internal data that directly contradicts the EPA, whether they should make that known. And the last thing I would say is that under the CFR, you know, if Toyota's response is, well, wait a minute, we can't be made to have two different masters, state and federal law. What if we're in this impossible position of complying with both? The FTC guidelines, I believe it's section 259 and cited in our briefing, say specifically that a manufacturer is allowed to make an additional estimate in addition to the EPA estimate for miles per gallon. Specifically, there is statutory authority under federal law just for this type of situation. So Toyota could say, look, the EPA estimate says 55. We've done a lot of testing right underneath that says you're really going to get something more like 40. All right. Thank you, counsel. Thank you to both counsel. The panel will confer, and we will prepare an order if we think it's necessary for supplemental briefing. Thank you very much. The case just ordered is submitted for decision by the court, and we are in recess until 9.30 a.m. tomorrow morning.
judges: Lemelle, Gould, Rawlinson